COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| LAQUAY DERAY ARNOLD, | § | No. 08-23-00038-CR |
| Appellant, | § | Appeal from the |
| v. | § | 26th Judicial District Court |
| THE STATE OF TEXAS, | § | of Williamson County, Texas |
| Appellee. | § | (TC# 18-2437-K26) |

### MEMORANDUM OPINION[1]

Following a bench trial, Appellant Laquay Deray Arnold was convicted of aggravated assault causing serious bodily injury. The trial court sentenced him to ten years' confinement; but suspended that sentence and placed him on community supervision for a term of five years. In his sole point of error, Arnold claims the evidence at trial was insufficient to support the court's rejection of his self-defense claim. We affirm.

## BACKGROUND

Arnold was charged by indictment with one count of aggravated assault causing serious bodily injury. Specifically, the charging instrument alleged that Arnold intentionally, knowingly,

---

[1] This case was transferred from the Austin Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of that court to the extent it might conflict with our own. *See* TEX. R. APP. P. 41.3.

and recklessly caused serious bodily injury to D.J.[2] by striking D.J. with his hand. Following Arnold's waiver of his right to a jury trial, the State presented its case to the bench.

On September 1, 2018, D.J., who was 16 years old at the time, described that he and a group of friends were hanging out near a park, around 8 p.m. at night. The group splintered as some of them went to play "ding-dong ditch," which meant, "[t]o ring someone's doorbell and run away." Separated from the group, D.J. remained near the park. Soon, he walked towards a pavilion where the group usually rendezvoused. As he walked in that direction, a car pulled up next to him and a man, later identified as Arnold, exited the vehicle. Arnold confronted D.J. asking whether he had "ding-dong ditched his house," and kicked in his door. D.J. responded, "No," explaining he had the wrong guy. Without warning, Arnold hit D.J. on the left side of his face with his fist. D.J. described that he immediately saw a light flash, he felt his face had broken, and he lost a tooth. As his mouth filled with blood, he felt shocked.

D.J. described that he never acted aggressively towards Arnold, never attempted to hit him, and used no confrontational words towards him. Nevertheless, Arnold continued to threaten him while asking him if he felt ready to die. Arnold next grabbed him by his shirt demanding to know who had kicked in his door. To diffuse the situation, D.J. gave him names of his friends, and guided him to the pavilion in the park.

On arrival, Arnold threatened D.J.'s friends, telling the group he was a convicted felon who could "beat them up pretty bad." Particularly, Arnold directed his attention to C.A. Another friend, J.W., soon arrived. After briefly observing, J.W. inserted herself between C.A. and Arnold. When J.W.'s mother soon arrived, Arnold continued to argue with her, and a larger fight ensued. D.J. called the police. As the crowd dispersed, Arnold also left the scene.

---

[2] We use initials to protect the anonymity of the complaining witness and other witnesses who were all minors at the time the offense was committed. *See* TEX. R. APP. P. 9.10(a)(3).

When police arrived and examined D.J.'s condition, they suspected he had sustained a broken jaw. He was soon taken to Dell Children's hospital where physicians confirmed his injury. As treatment, the medical team inserted a metal plate and wire into his mouth, which he wore for several weeks. By the time of his testimony at trial, he described that part of his face remained numb, and he continued to struggle with persistent drooling.

Along with D.J., J.W., M.L., and C.A. also testified at trial. J.W. described she had been talking with friends while outside the front of her house. Suddenly, she saw a "guy in a hoodie" run towards their front door. After he kick the door in, her dog ran out of the house. She chased after two males she saw running from the area. Eventually, she spotted D.J. running on the street closest to the trail leading to the pavilion. As she watched him, she saw Arnold—who she knew from his friendship with her mother—approach D.J. and exit his vehicle. While calling out to D.J., Arnold asked him whether he had kicked in her family's front door. When D.J. denied doing it, Arnold "struck him in the face right then and there." D.J. then held his jaw. She said she never saw D.J. move aggressively towards Arnold or act as if he were going to hit Arnold. Instead, D.J. "backed up," and he was "respectful" when answering Arnold's questions. Eventually, she, D.J., and Arnold, all made it over to the pavilion, where she next saw Arnold ball up his fist and aggressively confront C.A. At that point, she stood in front of C.A. while warning Arnold not to hit any of her friends. When J.W.'s mother soon arrived, they argued over something totally off topic. Arnold then got in his car and completely left the area without saying where he was going.

On cross-examination, when Arnold's counsel asked J.W. whether she told police she did not see Arnold punch D.J., she answered she did not remember making those statements. J.W. also testified that she had spoken to Child Protective Services (CPS) as part of the investigation. She admitted she had been dishonest when she denied she had seen who had punched D.J. She revealed at trial that Arnold had been pressuring her to keep quiet to ensure they were "all on the same

3

page" about the events that took place. J.W. identified Arnold in a photo line-up presented by police after the incident.

As a third witness, M.L. testified she saw D.J. walking on the street before Arnold stopped him. She also described that D.J. had not acted aggressively towards Arnold before Arnold became angry and punched him in the face. She described that D.J. looked "more scared" than hostile. After the punch, D.J. tried to get away from Arnold but he followed him to the pavilion.

As a fourth witness, C.A. testified he was a part of the group that ding-dong-ditched Arnolds's home. He testified that D.J. did not take part in playing the game. He described that another friend was the one who had kicked the door open. C.A. testified he merely stood by the driveway. He wanted to get a head start to run towards the pavilion. After he arrived at the pavilion, he saw Arnold and D.J. approaching the group. D.J. had a bloody face while Arnold held his shirt. Arnold was angry and questioned him aggressively. Once they learned that police were called, Arnold left the area. C.A. denied that Arnold seemed timid or afraid of any of the other males who were present.

Finally, the State also presented testimony from other witnesses including an ER physician, a responding officer, a detective who handled the investigation, and from D.J.'s father. Others identified Arnold as the man who hit D.J. Based on a comparison of height and weight, Arnold was described as "quite larger" than D.J., being that he was 50-pounds heavier and 6 inches taller.

In his case-in-chief, Arnold testified in his own defense. Providing background, Arnold testified that a year and half before the incident, in 2017, he had a heart transplant. He also had other serious health issues. He described himself as being in poor health, weighing about 180 pounds, or significantly less than what was documented on his driver's license. During his transplant recovery, he reconnected on Facebook with Hollye Peel, a friend with a background "in the heart field." After they dated, their romantic relationship evolved such that he spent increasing

4

time with her at her home. Arnold described two prior incidents that caused him concerns about the safety of the neighborhood where she lived. On one occasion, Peel's daughters came into her room talking about someone shining a light into the window of their room. He reacted by going outside but he didn't see anyone there. Another time a police helicopter circled the neighborhood looking for a suspicious white van.

On the night of the incident, he described he was home with Peel when he heard a loud "boom," causing him to look in the direction of the front door. He then saw that the door had been kicked wide open, and two individuals, who he believed were grown men wearing white T-shirts, were standing on the other side. As he ran outside, he saw J.W. was crying hysterically.

Due to his diminished physical condition, he was too physically weak to walk or chase anyone. He decided he would drive around the neighborhood looking for the men who had kicked in the door. While driving, he soon saw J.W. and Peel chasing D.J. He assumed D.J. was part of the group that had kicked in the door. Arnold testified he approached D.J. intending to learn where he lived so he could call the police. He viewed D.J. as a "cocky" man. He claimed he felt "sick" and "weak" during their confrontation.

Arnold testified he merely asked D.J. questions about the identities of the other guys who had kicked their door. Their conversation went back and forth three times before he noticed D.J. looking around, seemingly searching for his friends. Unsure of D.J.'s next move, Arnold took a step back. At that point, he saw D.J. swing his hand as if he were going to hit him. Because of his medical condition and poor health, he described that he was afraid. He threw a straight punch at D.J. to protect himself. When asked why he would put himself in a contentious situation knowing he was physically frail, he said he wanted answers from the individuals responsible for the incident.

Arnold next described that he followed D.J. to the pavilion, where he next questioned D.J.'s friends. Afterwards, he returned home on foot before police arrived on the scene. When asked why

5

he fled instead of waiting for police, he answered he had feared for his safety in the neighborhood, and he was not feeling well.

At the close of evidence, during closing argument, Arnold's counsel urged the trial court to find that Arnold protected his family and protected himself. The State urged the court to reject this claim and find Arnold guilty of the charged offense. After a short recess, the trial court found the evidence had established beyond a reasonable doubt that Arnold was in fact guilty of aggravated assault causing serious bodily injury. The trial court later sentenced Arnold to confinement for a term of ten years, but it then suspended the sentence and placed him on community supervision for five years. Arnold filed a motion for new trial, which was denied. This appeal followed.

## STANDARD OF REVIEW AND APPLICABLE LAW

A defendant raising self-defense has the burden of producing evidence to support the defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The State then has the burden of persuasion to disprove the raised defense; this burden only requires the State to prove its case beyond a reasonable doubt, but it has no burden of production of evidence. *Id.* When a fact-finder finds the defendant guilty, there is an implicit finding against the defensive theory. *Id.*

Because the State bears the burden of persuasion to disprove self-defense by establishing its case beyond a reasonable doubt, we review sufficiency challenges to the fact-finder's rejection of self-defense under the *Jackson* standard. *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979); *Gonzalez v. State*, No. 08-19-00062-CR, 2020 WL 7585890, at *4 (Tex. App.—El Paso Dec. 22, 2020, no pet.) (applying *Jackson v. Virginia* standard to a jury's rejection of self-defense claim). In resolving the sufficiency of the evidence issue, we look *not* to whether the State presented evidence which refuted appellant's self-defense; but rather, we determine whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have

6

found the essential elements of the offense beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt. *Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018).

It is solely the job of the fact-finder to assess witness credibility and attach weight to the witnesses' testimony. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As a reviewing court, we may not "sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1988) (en banc). Thus, the fact-finder, as the sole arbiter of witness credibility, can choose to believe or disbelieve witness testimony. *Metcalf*, 597 S.W.3d at 855. Further, only the fact-finder acts "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Jackson*, 443 U.S. at 319). When the record supports conflicting inferences, we defer to the fact-finder to resolve those conflicts and assume the conflicts were resolved in favor of the judgment. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) (citing *Jackson*, 443 U.S. at 319). Furthermore, the issue of self-defense is a fact issue for the fact-finder to resolve. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991) (en banc).

A person commits the offense of aggravated assault if the person intentionally, knowingly, or recklessly causes serious bodily injury to another. TEX. PENAL CODE ANN. § 22.01(a)(1); 22.02(a)(1)., "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). A "reasonable belief" is one held by "an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42). There is a subjective and objective component to a self-defense claim: not only must

7

an actor subjectively believe the use of force is immediately necessary to protect oneself, but that belief must be objectively reasonable. *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021).

## SELF-DEFENSE CLAIM

Arnold challenges the sufficiency of the evidence to support the trial court's rejection of his self-defense claim. In support of his argument, Arnold points to the suspicious events in the neighborhood and his poor health. With these circumstances in mind, Arnold claims the evidence established he was frightened when he perceived that D.J. had moved his arm in a manner as if he would hit him. Arnold further argues there is uncontroverted evidence that he had undergone a heart transplant several months prior to the incident. He asserts he was physically fragile, actively taking blood-thinners, and worried about the implications to his health if he were involved in a physical altercation with D.J. Arnold urges he punched D.J. once, but only enough to neutralize the threat of violence he perceived. Thus, Arnold avers that any ordinary and prudent individual in Arnold's shoes would have acted similarly to defend himself, and no rational trier of fact would have found against his self-defense claim beyond a reasonable doubt.

At trial, the testimony from three eyewitnesses differed significantly from Arnold's telling of the facts. The witnesses all testified to Arnold's aggressive demeanor. They described that D.J. had not acted aggressively towards Arnold; rather, it was D.J. who appeared scared of Arnold. First, D.J. testified that Arnold punched him in the face without warning or provocation. D.J. further stated that Arnold continued to threaten him afterwards, even threatening his life at one point, grabbed him by his shirt, and demanded that he give him names of his friends. Next, J.W. also testified to witnessing Arnold hit D.J. in the face, describing that she never saw D.J. make any aggressive movements towards Arnold. J.W. further testified that Arnold continued to be aggressive at the pavilion. She herself intervened to prevent Arnold from hitting another one of her friends. Additionally, C.A. testified Arnold had pulled D.J. by his shirt as they walked to the

pavilion. He described Arnold as being aggressive with his questioning and he looked angry. Lastly, M.L. described that he saw Arnold punch D.J. out of anger when he failed to give him the answers he wanted.

Viewing the record in its entirety, the claim of self-defense fell squarely on a question of credibility. *See Braughton*, 569 S.W.3d at 610 (providing that given two conflicting versions of events, it was the job of the jury to decide whether to believe Appellant's self-defense claim). If believed, the victim's testimony alone could support a guilty verdict. *Padilla v. State*, 254 S.W.3d 585, 590 (Tex. App.—Eastland 2008, pet. ref'd). Here, considering the conflicting testimony between Arnold, D.J, and several other witnesses, the trial court was free to reject Arnold's testimony as not being credible. *See Braughton*, 569 S.W.3d at 611. Further, the trial court was free to disbelieve Arnold's testimony about his fearful state of mind given he admitted on cross-examination that, despite his fear and frail physical condition, he intended to confront the individuals that he believed had been responsible for kicking in the family's door. And moreover, even after he admitted to punching D.J., Arnold proceeded to grab him by his shirt as they walked to the pavilion where he confronted other members of the group.

The trial court could have rationally concluded that Arnold had not been fearful of D.J. but instead sought confrontation out of vengeance. *See Lozano v. State*, 636 S.W.3d 25, 33 (Tex. Crim. App. 2021) ("[A] person's belief, absent direct evidence, generally must be inferred from the circumstances of the case."). Arnold testified he himself never called police, even after he had identified the individuals he believed had been responsible for the disturbing incident at his door. When police finally arrived, Arnold in fact fled the scene. Because our review requires that we resolve all inferences in favor of the judgment, we may assume the court rejected Arnold's claim that he fled out of fear, and instead, we may infer from this record that he fled to avoid

apprehension. *See Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) ("Evidence of flight . . . shows a consciousness of guilt of the crime for which the defendant is on trial.").

Viewing the evidence in the light most favorable to the court's judgment, we conclude that a rational trier of fact could have found the essential elements of aggravated assault beyond a reasonable doubt and against Arnold's claim of self-defense. *See* TEX. PENAL CODE ANN. § 19.03; *see also Braughton*, 569 S.W.3d at 609. Accordingly, we overrule Arnold's sole issue on appeal.

## CONCLUSION

We affirm the judgment of the trial court.

GINA M. PALAFOX, Justice

January 4, 2024

Before Alley, C.J., Palafox, and Soto, JJ.

(Do Not Publish)